[No. 31824-5-II.  Division Two.  April 26, 2005.]

WASHINGTON PUBLIC EMPLOYEES ASSOCIATION ET AL., *Appellants*, v. THE PERSONNEL RESOURCES BOARD ET AL., *Respondents*.

GENEVA L. SCHROLL ET AL., *Individually and as Class Representatives for All Others Similarly Situated*, *Appellants*, v. DISTRICT 1199 NW HOSPITAL AND HEALTH CARE EMPLOYEES UNION ET AL., *Respondents*.

*Daniel M. Hahn*, pro se.

*Cheryl A. Walpole*, pro se.

*Herbert T. Nelson*, pro se.

*Robert Benning*, pro se.

*Tony M. Perez*, pro se.

*Edward E. Younglove III* (of *Parr & Younglove, P.L.L.C.*) and *Martin S. Garfinkel* (of *Schroeter Goldmark & Bender*), for appellants.

*Robert M. McKenna, Attorney General*, and *Suzanne J. Shaw* and *Spencer W. Daniels, Assistants*, for respondents.

*Martha A. Barron* and *Paul Drachler* (of *Douglas Drachler & McKee, L.L.P.*), for intervenor District 1199 Northwest Hospital & Health Care Employees Union.

¶1 ARMSTRONG, J.—State employees working in general government and higher education (Employees) filed statutory and equal protection claims against the State, arguing that wage

disparities between employees in the two systems who perform essentially the same jobs violate the state civil service laws and the state and federal equal protection guaranties. The trial court granted summary judgment for the State. We reverse.

## FACTS

¶2 This appeal arises from historical pay disparities between certain classes of employees in the state general government and higher education who perform substantially similar work. In some of these common classes, the general government employees have higher base salaries than their counterparts in higher education. In others, the higher education employees do. The Employees here challenge the failure of the responsible state agencies to equalize the basic salary ranges for the affected common class employees.

¶3 In 1960, Washington voters passed Initiative 207, which created the state's Civil Service Law. LAWS OF 1960, ch. 1, §§ 1-35. The Civil Service Law established a new State Personnel Board and brought most general government employees under the Board's control. But each higher education institution had its own personnel committee that administered the institution's personnel policy. LAWS OF 1960, ch. 1, §§ 4(3), 5. In 1969, the legislature enacted the higher education personnel law, which established the Higher Education Board and charged it with administering classified higher education employees. LAWS OF 1969, 1st Ex. Sess., ch. 36, § 6. The legislature codified the higher education personnel law in a separate chapter (chapter 28B.16 RCW) from the Civil Service Law (chapter 41.06 RCW). *See* LAWS OF 1969, 1st Ex. Sess., ch. 36, § 32.

¶4 The State Personnel Board, through the Department of Personnel, and the Higher Education Board were both responsible for conducting biennial salary surveys for general government and higher education employees, respectively. The results of these surveys were given, along with

salary recommendations, to the Governor and budget director for use in preparing the budgets submitted to the legislature. LAWS OF 1961, ch. 1, § 16; LAWS OF 1969, 1st Ex. Sess., ch. 36, § 11.

¶5 In 1977, the legislature amended the salary survey statutes to require the State Personnel Board and the Higher Education Board to conduct joint salary surveys. LAWS OF 1977, 1st. Ex. Sess., ch. 152, §§ 2, 10. The "common class" concept central to the Employees' claims resulted from these amendments.

¶6 The 1977 amendments changed the Civil Service Law to require the Department of Personnel to provide a list of class codes and titles recommending monthly salary ranges for all classes under the Department's control, including those classes "which [were] substantially the same as classes being used by the [Higher Education Board] . . . clearly marked to show the commonality of the classes between the two jurisdictions." LAWS OF 1977, 1st Ex. Sess., ch. 152, § 2(3)(b). The legislature imposed the same requirement on the higher education personnel law. LAWS OF 1977, 1st. Ex. Sess., ch. 152, § 10(2)(b). These amendments also added a "statement of intent":

> Further, it is the intention of the legislature that the department of personnel and the higher education personnel board jointly determine job classes which are substantially common to both jurisdictions and that basic salaries for these job classes shall be equal based on salary and fringe benefit survey findings.

LAWS OF 1977, 1st Ex. Sess., ch. 152, §§ 2, 10.

¶7 As a result, the State Personnel Board and the Higher Education Board developed a common class list, which the agencies occasionally revised.

¶8 In 1993, the legislature abolished the State Personnel Board and the Higher Education Board and created the Personnel Resources Board, which assumed sole responsibility for the employees governed by the two boards. LAWS OF 1993, ch. 281, § 1. The 1993 amendments removed the

"common class" language from the Civil Service Law and the higher education personnel law. LAWS OF 1993, ch. 281, §§ 29, 68(15). This included the 1977 "statement of intent" language above. These amendments also repealed most of the higher education personnel law. *See* LAWS OF 1993, ch. 281, § 68.

¶9 On October 8, 1999, the Washington Public Employees Association and various individuals filed suit against the State, the Personnel Resources Board, Department of Personnel, and certain individuals. The same day, Geneva Shroll, Lisa Vasconi, and Andrea Tautfest, as individuals and as class representatives on behalf of a class of general government and higher education systems employees, sued the same defendants. The Thurston County Superior Court consolidated the cases. The Employees sought back pay and prospective relief as a result of the historical disparities in the base salary ranges for public employees in common job classes in Washington's general government and higher education systems.

¶10 The Employees and the State agreed on a settlement on April 5, 2001, conditioned on legislative funding. The State agreed to equalize base salaries for common class employees within three years and to promulgate new regulations and procedures for handling common class issues.

¶11 The parties agreed that as of April 2001, there were 172 pairs or sets of common classes, i.e., job classes in general government and higher education with substantially similar duties and responsibilities. Of these common classes, 141 were assigned lower base salary ranges. The general government system had 76 common classes with lower basic salaries; higher education had 65 common classes with lower basic salaries. For example, general government electricians were assigned a lower base salary range than higher education electricians. But higher education dieticians were assigned a lower base salary range than their general government counterparts. The total number of common class employees employed in classes with pay disparities was 4,064, with 3,375 general govern-

ment employees and 689 higher education employees having lower base salaries than their common class counterparts.

¶12 The legislature did not fund the settlement and the litigation resumed. Under CR 23(b)(2), the trial court certified the class as essentially all classified state employees in either general or higher education who, during the statute of limitations period, had been assigned a lower base salary range than their counterparts in the other system.

¶13 The parties cross-moved for summary judgment on liability on the Employees' statutory, equal protection, and constitutional certiorari claims. The trial court granted the State's motion, and the Employees appealed.

¶14 In 2002, the legislature made major changes to Washington's civil service laws. *See* LAWS OF 2002, ch. 354. For example, the legislature directed the Personnel Resources Board to conduct a comprehensive review of all rules in effect on June 13, 2002, governing the classification, allocation, and reallocation of positions within the classified service. LAWS OF 2002, ch. 354, § 205 (codified at RCW 41.06.136(1)). By March 15, 2004, the Personnel Resources Board was to have adopted new rules governing the classification of jobs in the classified service, adhering to the goal of developing a simplified classification system to substantially reduce the number of job classifications. LAWS OF 2002, ch. 354, § 205 (codified at RCW 41.06-.136(2)(b)). And the director of personnel was required to begin implementing a new classification system for classified service employees by January 1, 2005. LAWS OF 2002, ch. 354, § 206 (codified at RCW 41.06.139).

## ANALYSIS

### I. Civil Service Law

■ ¶15 The Employees argue that RCW 41.06.150(14)[1] requires the Personnel Resources Board to adopt a single state salary schedule to "reflect the prevailing rates in Washington state private industries" and other governmental units. Br. of Appellant at 17-19. They reason that the statutory language implies that the Personnel Resources Board must adopt a single schedule because two schedules could not both reflect the prevailing rates. But we need not decide whether the statute requires one salary schedule for all state employees because even if it does, the Employees cannot prove they are entitled to the relief they seek.

¶16 The Employees seek an order that they have been deprived of "equal pay for equal work." Clerk's Papers (CP) at 721. To obtain such an order, the Employees would first have to show what single salary schedule the Personnel Resources Board would have adopted and when the Board would have adopted it. The Employees assume the single schedule would be at the higher salary paid in the common classes. But nothing in the statute requires this. The Personnel Resources Board might have adopted the higher salary, the lower salary, or something in between. Next, the Employees would have to show that the director of financial management would have approved the single schedule. RCW 41.06.150(14). Then, the Employees would have to show that the Governor would have sent the single schedule to the legislature. *See Teamsters, Chauffeurs, Warehouse, & Helpers Union Local No. 313 v. Dep't of Corr.*, 119

---

[1] "(14) Adoption and revision of a state salary schedule to reflect the prevailing rates in Washington state private industries and other governmental units but the rates in the salary schedules or plans shall be increased if necessary to attain comparable worth under an implementation plan under RCW 41.06.155 and that, for institutions of higher education and related boards, shall be competitive for positions of a similar nature in the state or the locality in which an institution of higher education or related board is located, such adoption and revision subject to approval by the director of financial management in accordance with the provisions of chapter 43.88 RCW."

Wn. App. 478, 479-80, 81 P.3d 875 (2003). Finally, the Employees would have to show that the legislature would have implemented the salary schedule. *Teamsters, Chauffeurs, Warehouse, & Helpers*, 119 Wn. App. at 480. Yet the legislature has demonstrated considerable reluctance in adopting the Personnel Resources Board's salary recommendations, refusing to fund even the parties' settlement here.

¶17 The Employees have offered no evidence that any of these conditions would have been met. In short, the Employees cannot prove they are entitled to an order under the statute that they have been deprived of equal pay. They base the request solely on the Personnel Resources Board's failure to adopt a single salary schedule. And this is only the first in a series of conditions that the Employees would have to prove to be entitled to, ultimately, a judgment for back pay. They have not and cannot prove the other conditions in the series.

## II. Equal Protection

¶18 The Employees argue that the State's failure to equalize the basic salaries of common class employees violates the protections of the federal equal protection clause and state privileges and immunities clause. At the outset, they claim that courts analyze the state and federal equal protection guaranties as one issue. The case they cite, *American Network, Inc. v. Washington Utilities & Transportation Commission*, 113 Wn.2d 59, 77, 776 P.2d 950 (1989), does stand for this proposition. But in *Grant County Fire Protection District No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 811, 83 P.3d 419 (2004), the court recently held that Washington's privileges and immunities clause and the federal equal protection clause must be considered separately. The State cites *Grant County* in a footnote and correctly points out that the Employees have not argued for a separate or more expansive interpretation of the state's privileges and immunities clause. Accordingly, we analyze

the Employees' argument under the federal equal protection clause.

¶19 A party challenging a classification bears the burden of proving that it violates equal protection. *Wash. Educ. Ass'n v. Smith*, 96 Wn.2d 601, 609, 638 P.2d 77 (1981), (citing *State Sch. Dir. Ass'n v. Dep't of Labor & Indus.*, 82 Wn.2d 367, 376-77, 510 P.2d 818 (1973)). The first step in any equal protection analysis is determining the appropriate standard of review. *Foley v. Dep't of Fisheries*, 119 Wn.2d 783, 789, 837 P.2d 14 (1992) (citing *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 139, 744 P.2d 1032, 750 P.2d 254 (1987)). In equal protection cases involving finite state resources where the state's classification does not turn on a fundamental right or suspect classification, we apply the rational basis test. *Willoughby v. Dep't of Labor & Indus.*, 147 Wn.2d 725, 739, 57 P.3d 611 (2002); *see Philippides v. Bernard*, 151 Wn.2d 376, 391, 88 P.3d 939 (2004).

¶20 A classification must be purely arbitrary to overcome the strong presumption that it is constitutional. *Rhoades v. City of Battle Ground*, 115 Wn. App. 752, 759, 63 P.3d 142 (2002), *review denied*, 149 Wn.2d 1028 (2003) (citing *Thurston County Rental Owners Ass'n v. Thurston County*, 85 Wn. App. 171, 186, 931 P.2d 208 (1997)). Here, the government action at issue is the failure to equalize basic salaries among employees in the general government and higher education systems who do essentially the same work.

¶21 The Supreme Court has explained that under the rational basis test, the court will uphold the government action if (1) the government action in question applies alike to all members of the designated class, (2) there are reasonable grounds to distinguish between those within and those without the class, and (3) the classification has a rational relationship to the legislative purpose. *Auto. Drivers & Demonstrators Union Local No. 882 v. Dep't of Ret. Sys.*, 92 Wn.2d 415, 422, 598 P.2d 379 (1979); *DeYoung v.*

*Providence Med. Ctr.*, 136 Wn.2d 136, 144, 960 P.2d 919 (1998); *see also Rhoades*, 115 Wn. App. at 759.

¶22 The analysis is not easily applied. In some cases the court, after reciting the three-part test, has not explained what the designated class is or what it is comparing its members to. *See DeYoung*, 136 Wn.2d at 144-45. In at least one case, the court defined the designated class, found that all members of the class are treated the same as required by step one, and then, in an apparent inconsistency, compared some members of *the* class to other class members who are treated *differently*. *Salstrom's Vehicles, Inc. v. Dep't of Motor Vehicles*, 87 Wn.2d 686, 694-95, 555 P.2d 1361 (1976). Moreover, if we are to compare members of the designated class with persons outside the class, it should not matter whether all members of the designated class are treated alike because a class of one qualifies for equal protection. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam). If a single person is entitled to equal protection, it makes no sense to speak of a class in which all members must be treated the same. Finally, to require that all members of the designated class be treated alike ignores the reality that for rational basis economic harm cases, the state action generally creates the classes. Here, for example, to be a member of the designated class, the worker must be treated differently from other state employees doing the same work. Thus, only those workers who receive disparate treatment are in the designated class. Any worker who is not paid less than another worker doing the same job is simply not a class member.

¶23 Perhaps because of these conceptual obscurities, the court has restated the test as "[s]trictly speaking, a statute creates only *one* relevant class, whereby differential treatment creates subgroups within the general class." *Willoughby*, 147 Wn.2d at 739.

¶24 In *Willoughby*, the court considered statutes that suspended Labor and Industries' benefits to prisoners who had no beneficiaries and were unlikely to ever be released

from prison; prisoners who had beneficiaries or were likely to be released qualified for the benefits. As here, the parties disputed the State's classifications. Labor and Industries argued that the classes were Labor and Industries covered workers who were incarcerated as opposed to covered workers who were not incarcerated. The court disagreed, holding that the overall class was Labor and Industries covered workers who were incarcerated; within that class, the subgroups were (1) prisoners who had beneficiaries or were likely to be released and (2) prisoners who had no beneficiaries and were unlikely to be released. *Willoughby*, 147 Wn.2d at 740-41. Key to the court's choice of class and subgroups was that the State's different treatment of prisoners turned not upon whether they were prisoners, but whether they were lifetime prisoners without beneficiaries. *Willoughby*, 147 Wn.2d at 741.

■ ¶25 Most recently, the court has explained the equal protection right as the guaranty "that persons similarly situated with respect to a legitimate purpose of the law receive like treatment." *State v. Harner*, 153 Wn.2d 228, 235, 103 P.3d 738 (2004).

■ ¶26 The parties disagree on the appropriate classifications. The Employees argue that the disadvantaged class consists of those employees in the general government and higher education systems with lower basic salaries than their counterparts in the other system; the Employees compare the disadvantaged class members with those employees in either system who earn a higher base salary. The State responds that the classes are (1) all general government employees and (2) all higher education employees.[2] The State reasons that the members of each class are treated the same as other members in the class and that

---

[2] The State also argues that the Employees are defining the classes as described above for the first time on appeal. The portions of the record they cite do not support their statement; when the Employees spoke of the classes as being general government and higher education employees, they clearly meant this only in the context of the common class employees.

there is a rational basis to treat higher education employees differently than general employees.[3]

¶27 We agree with the Employees. Under *Willoughby*, the single class is all state employees who perform the same job as other state employees in the other employment system. Under a *Harner* analysis, these are similarly situated employees entitled to like treatment. Yet some have a lower base salary than their counterparts in the different department. We reject the State's proposed classification because, as in *Willoughby*, the lower paid employees are not paid less *because* they are in the particular group. Rather, the lower base salaried employees are distributed randomly between the two employment systems; higher education employees are not uniformly paid either more or less than general state employees. Seventy-six general government job classes and sixty-five higher education job classes had pay disparities. For example, general government electricians were assigned a lower base range than their higher education counterparts, but general government dieticians were assigned a higher range than their higher education counterparts.

¶28 Our analysis of the designated class, similarly situated employees, is consistent with *Automobile Drivers & Demonstrators Union Local No. 882*. There, the court considered whether the state denied port police equal protection by excluding them from the Law Enforcement Officers' and Fire Fighters' Retirement System (LEOFF). The port police argued that they performed the same duties as regular police officers who were LEOFF members and that the state also allowed port fire fighters to be LEOFF members. Without discussion, the court concluded that

---

[3] For example, before July 1, 2004, higher education employees had locality pay. Former RCW 41.06.150(14) (1993). And rules adopted under the new version of the statute "shall provide for local administration and management by the institutions of higher education and related boards." RCW 41.06.150(7). The rules adopted for managers in general government under RCW 41.06.500 do not apply to higher education employees. And from July 1, 1993 until July 1, 2003, higher education employees and their institutions could agree to have their collective bargaining governed by the Public Employment Relations Commission. RCW 41.56.201.

identity of duties established the designated class and then concluded that reasonable grounds existed to treat port police officers differently than regular police officers who performed the same duties. *Automobile Drivers*, 92 Wn.2d at 423-24. Similarly, here the state workers' identity of duties defines the designated class. We turn then to the question of whether a rational basis exists to treat the lower paid employees differently.

¶29 The State argues that because general government employees and higher education employees have historically been treated differently in many other respects, the State may set lower base salaries for some, even though they do the same work as their higher paid counterparts. It relies primarily on *Smith* and *Automobile Drivers*. But this analysis is based upon the State's classification that compares higher education employees to general state employees, a classification we have rejected. The cases illustrate the problem.

¶30 In *Smith*, the court held that prohibiting community college teachers from making payroll deductions for political action committees while allowing such deductions for common school employees did not violate equal protection. The court concluded that the two groups were "two very distinct classes" and focused on the different treatment that community college and common school teachers received. For example, they were governed by different RCW titles, the former were paid by the State while the latter were paid by local school districts, and the State's fiscal and payroll management was much more complex, serving far more employees than did any single school district. *Smith*, 96 Wn.2d at 609-10. In *Smith*, the different ways the two classes were treated helped explain why the different treatment specifically at issue was rational. But here, the State's proposed classification fails. We are not comparing higher education employees with general state employees; we are comparing lower paid employees in both systems against higher paid employees in both systems doing the same work. The differences between the two systems are irrelevant.

¶31 In *Automobile Drivers*, the court found a rational basis to distinguish between port police officers and regular police officers because the legislature may have been concerned with the solvency of LEOFF and because the port officers had authority to establish their own retirement system. *Automobile Drivers*, 92 Wn.2d at 423-24. Again, the case does not help the State because we have rejected the State's proposed classification.

¶32 We conclude that the State's failure to equalize basic salary levels bears no rational relationship to the purposes of Washington's Civil Service Laws. Dorothy Gerard, the head of the department's personnel services division, testified that she agreed with the conclusion in the 1975 performance audit of state salary setting methods that "[t]here [was] no defensible rationale which justifies the existing procedure of paying in some cases substantially different salaries to state employees for similar or identical job duties and/or responsibilities." CP at 187. While the 1993 amendments to the Civil Service Law removed the "statement of intent" language about paying equal salaries to common classes, the State replaced the two salary setting boards with a single board and directed it to adopt *a* state salary schedule. This, coupled with Gerard's concession that pay disparities were the result of historical practice rather than job differences, leads us to conclude that no rational basis exists to set different base salary schedules for state workers doing essentially the same work.

¶33 We hold that the State has denied the Employees equal protection by failing to provide equal pay for essentially equal work. We reverse and remand.

MORGAN, A.C.J., and VAN DEREN, J., concur.